**Exhibit H to Joint Pretrial Memorandum**
**(The Litigation Administrator's Statement of the Case)**

**Table of Contents**

**Page**

I.    Litigation Administrator will be able to prove his *prima facie* preference case..................1

    A.    Background of the Transfers at issue.......................................................................1

    B.    Legal standards for satisfying the *prima facie* preference case. .............................1

    C.    Defendant does not contest the majority of the elements of the
    Litigation Administrator's *prima facie* preference case. ..........................................2

    D.    Even if Defendant did not already so stipulate, the Litigation
    Administrator will be able to satisfy each element of his *prima facie*
    preference case.......................................................................................................2

        i.    The Transfers were made to or for the benefit of Defendant.......................2

        ii.    The Transfers were of an interest in the Debtors' property. .......................2

        iii.    The Transfers were made on account of an antecedent debt. .....................3

        iv.    The Debtors were insolvent when they made the Transfers. ......................3

        v.    The Transfers were made within the 90 days prior to the
        Petition Date............................................................................................4

        vi.    The Transfers enabled Defendant to receive more than it would
        have received if the case was under Chapter 7 and the Transfers
        had not been made. ..................................................................................5

II.    Defendant will be unable to satisfy its burden to demonstrate any of its
affirmative defenses to the preference claim by a preponderance of admissible
evidence. ........................................................................................................................6

    A.    Defendant has no Ordinary Course Defense...........................................................6

        i.    Legal tests for assessing the Ordinary Course Defense. .............................6

        ii.    Defendant has no Ordinary Course Defense under the Average
        Lateness method.......................................................................................8

        iii.    Defendant has no Ordinary Course Defense under the Total
        Range method. .........................................................................................9

iv.      Defendant has no Ordinary Course Defense under the Single Standard Deviation method..........................................................................9

B.      Defendant has no New Value Defense. ..............................................................10

i.      Elements of a New Value Defense. ...........................................................10

ii.      Defendant has no admissible evidence to prove the New Value Defense. ....................................................................................................11

C.      Defendant will be unable to demonstrate lack of due diligence. ...........................13

III.      The Litigation Administrator will show that Defendant violated the automatic stay by cancelling existing purchase orders that were open as of the Petition Date and upcharged the Debtors by $3 per yard.................................................15

IV.      Each of the post-petition transfers were outside the ordinary course of business for numerous reasons. .......................................................................................16

A.      Unauthorized transactions outside the ordinary course are avoidable under 11 U.S.C. § 549..........................................................................................16

B.      Legal standards for assessing whether a transaction occurs in the ordinary course of business....................................................................................17

C.      The post-petition transfers to Valdese were outside the ordinary course for many reasons. ...........................................................................................19

i.      Valdese cancelled all open purchase orders and instituted a $3 upcharge to recoup its pre-petition debt owed by the Debtors. .................19

ii.      Valdese changed the payments terms by requiring payment be made cash in advance instead of shipping goods on credit. .....................20

iii.      All of the post-petition transfers were made by wire instead of check. .....................................................................................................22

iv.      The Debtors overpaid Valdese and Valdese refused to give the money back without effecting a setoff of amounts purportedly owed to Valdese.......................................................................................22

V.      Defendant will be unable to assert any credit on account of its reclamation demand.............................................................................................................23

A.      Standards for seeking reclamation. ....................................................................23

B.      A reclamation demand must be made while the Debtors are insolvent.................24

C.      The reclamation demand fails for numerous grounds...........................................25

i.      Defendant cannot satisfy its burden to demonstrate when goods subject to the reclamation demand were actually received by the Debtors. ...................................................................................25

ii.     Defendant will be unable to demonstrate what goods were in the Debtors' possession when the reclamation demand was made. ................26

iii.    Defendant failed to undertake sufficient action after sending the reclamation demand. ................................................................................26

iv.     Defendant will be unable to prove that the Debtors were insolvent when it received the goods subject to the reclamation demand. ...................................................................................................27

The following is the Litigation Administrator's statement of the case.

**I.      Litigation Administrator will be able to prove his *prima facie* preference case.**

      **A.      Background of the Transfers at issue.**

      1.      The Debtors commenced voluntary Chapter 11 cases on February 12, 2019.

      2.      The lookback period for avoiding preferential transfers is November 14, 2018 to February 12, 2019 (the "<u>Preference Period</u>").

      3.      The Debtors made the following transfers to Defendant Valdese Weavers, LLC ("<u>Valdese</u>" or "<u>Defendant</u>") during the Preference Period:

| Check No. | Check Clear Date | Check Amount |
|:---:|:---:|:---:|
| 531443 | 11/14/2018 | $85,037.94 |
| 531433 | 11/14/2018 | $21,545.14 |
| 531700 | 11/26/2018 | $36,807.55 |
| 530841 | 11/26/2018 | $2,787.49 |
| 531687 | 11/26/2018 | $19,086.90 |
| 531353 | 11/30/2018 | $1,638.33 |
| 532090 | 11/30/2018 | $24,206.81 |
| 532103 | 12/4/2018 | $44,381.52 |
| 532394 | 12/10/2018 | $80,012.86 |
| 532392 | 12/10/2018 | $71,814.19 |
| 531549 | 12/10/2018 | $693.00 |
| 532378 | 12/10/2018 | $15,814.84 |
| 532379 | 12/10/2018 | $3,834.79 |
| 532606 | 12/18/2018 | $35,288.81 |
| 531807 | 12/18/2018 | $676.77 |
| 532207 | 12/18/2018 | $982.10 |
| 532594 | 12/18/2018 | $33,121.16 |
|  |  | $477,730.20 |

*See* PX-1 (Complaint); PX-2 and 3 (bank account statements).

      **B.      Legal standards for satisfying the *prima facie* preference case.**

      4.      Pursuant to Section 547(b) of the Bankruptcy Code, the Litigation Administrator can recover a pre-petition transfer of an interest of the debtor's property if the transfer was (1) made by the debtor to or for the benefit of a creditor; (2) made on account of an antecedent debt;

(3) made at a time when the debtor was insolvent; (4) made within the 90-day period immediately preceding the Petition Date (defined below); and (5) enabled the creditor to receive more than it would have received if the transfer had not been made by the debtor and the case was converted to a case under chapter 7 of the Bankruptcy Code. As discussed below, each of these elements have been satisfied.

**C. Defendant does not contest the majority of the elements of the Litigation Administrator's *prima facie* preference case.**

5. There can be no dispute as to the majority of the elements of Section 547(b) because Defendant admit each element has been satisfied. *See* Exhibit E at ¶¶ 8-9 (Transfers (defined below) were made by the Debtors from the Debtors' property); *id.* at ¶¶ 10-11 (Transfers were made to or for the benefit of Defendant); *id.* at ¶ 12 (Transfers made on account of an antecedent debt); *id.* at ¶¶ 13-15 (Transfer paid within 90 days of the Petition Date).

**D. Even if Defendant did not already so stipulate, the Litigation Administrator will be able to satisfy each element of his *prima facie* preference case.**

**i. *The Transfers were made to or for the benefit of Defendant.***

6. The Transfers were paid to Defendant from funds in the Debtors' operating account ending in 2033 at Wells Fargo (the "Operating Account"). *See* PX-2 and 3 (bank account statements).

**ii. *The Transfers were of an interest in the Debtors' property.***

7. While the Bankruptcy Code does not define "an interest of the debtor in property," courts have interpreted the term to mean property that would have been part of the bankruptcy estate had it not been transferred before commencement of bankruptcy. *See Glinka v. Bank of Vermont (In re Kelton Motors)*, 97 F.3d 22, 25 (2d Cir. 1996) (citing *Begier v. IRS*, 496 U.S. 53 (1990)). Property of the Debtors' estate includes all of the Debtors' legal and equitable interests

in property.  *See* 11 U.S.C. § 541; *see also Daly v. Radulesco (In re Carrozzella & Richardson)*, 247 B.R. 595, 600 (B.A.P. 2d Cir. 2000).  Courts determine what constitutes a legal or equitable interest by looking to applicable state law.  *See, e.g.*, *In re Kelton Motors*, 97 F.3d at 25.

8.      Here, the Transfers came from the Debtors' Operating Account.  The Operating Account was the operating account for Debtor The Robert Allen Duralee Group, Inc., which serves as the main account in which the Debtors' funds were concentrated and from which funds were transferred as needed to several other accounts.  *See* PX-4 (Cash Management Motion) at ¶ 16.

### iii.      *The Transfers were made on account of an antecedent debt.*

9.      The Bankruptcy Code does not define the term "antecedent debt," but Section 101(12) defines the term "debt" to mean "liability on a claim," and Section 101(5)(A) defines the term "claim" to be a "right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured." *Jacobs v. Matrix Capital Bank (In re AppOnline.com, Inc.)*, 315 B.R. 259, 277-78 (Bankr. E.D.N.Y. 2004); *see also Mazzeo v. United States (In re Mazzeo)*, 131 F.3d 295, 302 (2d Cir. 1997) ("the term 'debt' is sufficiently broad to cover any possible obligation to make payment, whether that obligation is liquidated or unliquidated, fixed or contingent, disputed or undisputed, and whether or not it is embodied in a judgment").  Here, Defendant has stipulated that the Transfers were made on account of an antecedent debt.  *See* Exhibit E at ¶ 12.

### iv.      *The Debtors were insolvent when they made the Transfers.*

10.      Section 547(f) of the Bankruptcy Code provides that a "debtor is presumed to have been insolvent on and during the 90 days immediately preceding the date of the filing of the petition."  11 U.S.C. § 547(f).

11.     The presumption alone is sufficient to satisfy the insolvency prong of a preference claim and the element is satisfied if the party seeking to rebut the presumption fails to come forward with evidence that the debtor was solvent at the time of the transfer. *See, e.g.*, *McColley v. Navaro Gem Ltd. (In re Candor Diamond Corp.)*, 68 B.R. 588, 592 (Bankr. S.D.N.Y. 1986) (this presumption "requires the party against whom the presumption exists to come forward with some evidence to rebut the presumption"); *see also Young v. Nadelson Displays, Inc. (In re Lucasa Int'l, Ltd.)*, 14 B.R. 980, 982 (Bankr. S.D.N.Y. 1981) (placing burden on transferee to come forward with evidence rebutting statutory presumption of insolvency); *Bros. Gourmet Coffees, Inc. v. Armenia Coffee Corp. (In re Bros. Gourmet Coffees, Inc.)*, 271 B.R. 458 (Bankr. D. Del. 2002) ("Here, on the issue of insolvency, [defendant] must rebut the presumption by showing that there are no material facts in dispute on the issue and that Debtor was solvent at the times of the transfers."); *Lids Corp. v. Marathon Inv. Partners, L.P. (In re Lids Corp.)*, 281 B.R. 535, 543 (Bankr. D. Del. 2002) (debtors insolvency presumed because there was "significant doubt about the validity" of evidence seeking to rebut the presumption of insolvency).

12.     The Litigation Administrator anticipates that Defendant does not have any evidence to rebut this presumption of insolvency under 11 U.S.C. § 547(f).

   **v.**  ***The Transfers were made within the 90 days prior to the Petition Date.***

13.     The Preference Period began on November 14, 2018 and ended on February 12, 2019, the Petition Date.

14.     The Transfers occurred during the Preference Period.

15.     Therefore, the Transfers were made during the 90 days prior to the Debtors filing for bankruptcy.

> **vi.    *The Transfers enabled Defendant to receive more than it would have received if the case was under Chapter 7 and the Transfers had not been made.***

16.    The Transfers enabled Defendant to receive more than it would have received if the case was under Chapter 7 of the Bankruptcy Code and the Transfers had not been made.  "As a practical matter, this element of a preference is almost always satisfied where a debtor transfers property to an unsecured creditor . . . and the creditor would receive less than 100% in a Chapter 7 liquidation."  *In re Candor Diamond Corp.*, 68 B.R. at 595; *see also AmeriServe Food Distrib., Inc. v. Transmed Foods, Inc. (In re AmeriServe Food Distrib., Inc.)*, 315 B.R. 24, 32 (Bankr. D. Del. 2004) (if a creditor is to receive less than a 100 percent payment from the estate in a Chapter 7 liquidation, then Section 547(b)(5) is satisfied).

17.    Here, the Debtors' debt to Defendant would be treated as an unsecured claim if the case was in Chapter 7.

18.    Indeed, Defendant admits this by filing a proof of claim, classifying its debt as being unsecured.  *See* PX-5 and 6 (Valdese's proofs of claim).

19.    The Debtors' assets are insufficient to fully pay all of its unsecured creditors after paying the secured, administrative and priority creditors.  The Debtors estimated prior to plan confirmation that unsecured creditors, such as Defendant, therefore, will receive between .5% to 5.0% of their allowed general unsecured claims, far less than the 100% distribution Defendant obtained by receiving the Transfers.  *See* PX-7 (Disclosure Statement).

20.    Since then, the Debtors have made zero distributions to unsecured creditors and do not anticipate paying them in full.  *See* PX-8 (Post Confirmation Report).

21.    Thus, since Defendant received the Transfers, it is clear that Defendant received more than it would have received had the case been a liquidation under Chapter 7 and the Transfers

had not been made.  *See In re AmeriServe Food Distrib., Inc.*, 315 B.R. at 32-33 (the "greater percentage" element was met where there is "no dispute that this case will not return one hundred percent to unsecured creditors").

II.     **Defendant will be unable to satisfy its burden to demonstrate any of its affirmative defenses to the preference claim by a preponderance of admissible evidence.**

22.     The Litigation Administrator expects Defendant to argue several affirmative defenses to the preference claim, including without limitation, that:

(i)     Defendant has an "ordinary course defense" under 11 U.S.C. § 547(c)(2) (the "<u>Ordinary Course Defense</u>");

(ii)    Defendant is entitled to a credit on account of subsequent new value under 11 U.S.C. § 547(c)(4) (the "<u>New Value Defense</u>"); and

(iii)   The Litigation Administrator purportedly failed to undertake sufficient pre-filing due diligence as required under 11 U.S.C. § 547(b).

23.     Of course, Defendant bears the burden of proof on all of its affirmative defenses. *See* 11 U.S.C. § 547(g) ("the creditor or party in interest against whom recovery or avoidance is sought has the burden of proving the nonavoidability of a transfer under subsection (c) of this section").  Defendant will be unable to satisfy its burden on any of these anticipated defenses for numerous reasons.

   A.     **Defendant has no Ordinary Course Defense.**

      i.     ***Legal tests for assessing the Ordinary Course Defense.***

24.     Section 547(c)(2) of the Bankruptcy Code states that a transfer is protected from avoidance only "to the extent that such transfer was in payment of a debt incurred by the debtor in the ordinary course of business or financial affairs of the debtor and the transferee," and such transfer was either (A) "made in the ordinary course of business or financial affairs of the debtor and the transferee;" or (B) "made according to ordinary business terms."

25.    Courts apply the so-called "average lateness method" and the "total-range method" for determining whether a defendant has an Ordinary Course Defense. *See Ryniker v. Kaufmann (In re Décor Holdings, Inc.)*, Adv. Pro. No. 21-08040 (REG), 2022 Bankr. LEXIS 303, at *6 (Bankr. E.D.N.Y. Feb. 3, 2022).  In addition courts in this Circuit have applied a single standard deviation analysis for assessing the Ordinary Course Defense.

26.    Under the average lateness method, courts consider the average time of payment after the issuance of an invoice during the pre-preference period and post-preference periods.  *Id.*; *accord Jacobs v. Gramercy Jewelry Mfg. Corp. (In re M. Fabrikant & Sons, Inc.)*, Adv. Pro. 08-1690 (SMB), 2010 Bankr. LEXIS 3941, at *8 (Bankr. S.D.N.Y. Nov. 4, 2010).  Indeed, the average lateness method is the preferred test because, as this Court has previously noted, "[t]he starting point — and often the ending point — involves consideration of . . . the so-called 'average lateness' computation theory."  *Ryniker*, 2022 Bankr. LEXIS 303, at *5-6 (quoting *Fabrikant*, 2010 Bankr. LEXIS 3941, at *8).

27.    Under the total-range method, courts review all payments made during the pre-preference baseline period, determines the range of payments from the earliest to the latest, and if the payments made during the preference period fit within the range, they are protected by the Ordinary Course Defense.  *Ryniker*, 2022 Bankr. LEXIS 303, at *6-7.  Courts typically apply the total-range method if they find that the difference in pre- and preference period averages are "material" or "skewed by outliers."  *Id.* at *6.

28.    Under the single standard deviation analysis, the Ordinary Course Defense protects payments made within a single standard deviation from the mean (or the average).  *Pereira v. UPS (In re Waterford Wedgwood USA, Inc.)*, 508 B.R. 821, 837 (Bankr. S.D.N.Y. 2014) (applying single standard deviation analysis).  Payments made within a single standard deviation of the

average on both sides of the mean – thereby incorporating approximately 68% of payments – are protected under the Ordinary Course Defense.  *See id.* at 836 n.14 ("In plain English, when the standard deviation number is applied to both sides of the mean, the numbers that fall within the resulting range will encompass 67.76 percent of all numbers used to arrive at the mean.") (citation omitted).

> ### ii.   *Defendant has no Ordinary Course Defense under the Average Lateness method.*

29.    In the Preference Period, the averages days outstanding from the invoice date (in contrast to day past due after the invoice due date) was 58 days outstanding.  In comparison to a baseline period consisting of transfers from approximately 2 years prior to the petition date, the average days outstanding was nearly 81 days.  Alternatively, a baseline course of dealings going back 1-year from the Petition Date yields an average of over 88 days.  Regardless of whether a 1- or 2-year baseline course of dealing is applied, there is a monumental change of nearly 30 days. To make matters worse, the Preference Period transfers were made *faster* than in the baseline course.

30.    As this Court noted, the average lateness test only protects averages with smaller deltas between the baseline and preference periods.  *See Ryniker*, 2022 Bankr. LEXIS 303, at *11 (collecting cases); *see Unsecured Creditors Comm. of Sparrer Sausage Co. v. Jason's Foods, Inc.*, 826 F.3d 388, 396 (7th Cir. 2016) (5 day change in average protected); *Lovett v. St. Johnsbury Trucking*, 931 F.2d 494 (8th Cir. 1991) (10 day change protected); *Pirinate Consulting Group, LLC v. Kadant Solutions Div. (In re NewPage Corp.)*, Adv. Pro. No. 13-52520 (KG), 2016 Bankr. LEXIS 3561 (Bankr. D. Del. Sept. 30, 2016) (9 day difference protected); *Stanziale v. Industrial Specialists Inc. (In re Conex Holdings, LLC)*, 522 B.R. 480, 490 (Bankr. D. Del. 2014) (7 day

difference protected); *McCord v. Venus Foods (In re Lan Yik Foods Corp.)*, 185 B.R. 103 (Bankr. E.D.N.Y. 1995) (21 day difference protected).

31.     Here, the difference in the average lateness between the baseline course and Preference Period transfers is nearly *30 days* – 3 times as long as in many other cases – and significantly longer than the biggest delta that this court identified in its *Ryniker* decision.

        **iii.**      **Defendant has no Ordinary Course Defense under the Total Range method.**

32.     Defendant does not have an Ordinary Course Defense under a Total Range method form of analysis because the 2-year baseline period payments ranged from 23 to 471 days outstanding – a colossal range of nearly 450 days.

33.     This range is too broad to support an Ordinary Course Defense because courts routinely require payments be made within a much narrower range.  *See, e.g.*, *Miller v. Westfield Steel, Inc. (In re Elrod Holdings Corp.)*, 426 B.R. 106, 110 (Bankr. D. Del. 2010) (range of 35-73 days); *Menotte v. Oxyde Chems., Inc. (In re JSL Chem. Corp.)*, 424 B.R. 573, 581 (Bankr. S.D. Fla. 2010) (range of 0-33 days); *Bros. Gourmet Coffees, Inc. v. Armenia Coffee Corp. (In re Bros. Gourmet Coffees, Inc.)*, 271 B.R. 456, 461 (Bankr. D. Del. 2002) (range of 0-31 days).

        **iv.**      **Defendant has no Ordinary Course Defense under the Single Standard Deviation method.**

34.     Under a single standard deviation analysis, the average days (*i.e.*, the mean) that payments in the 2-year baseline period were made was approximately 81 days and a single standard deviation – encompassing approximately 68% of payments – covered a range of +/- approximately 43 days from the mean, yielding a range of approximately 38 to 125 days.  This is far too broad to support an Ordinary Course Defense.

35.    Likewise, a single standard deviation analysis based on the 1-year baseline period yields a mean of 88 days outstanding.  A single standard deviation – encompassing approximately 68% of these transfers – results in a single standard deviation of 47 days.  The range based on this single standard deviation (which, again is added and subtracted from the mean) yields a range of 41 days to 135 days – again a range that is far too broad to support an Ordinary Course Defense.

36.    For the foregoing reasons, Defendant does not have an Ordinary Course Defense under any form of analysis.

**B.    Defendant has no New Value Defense.**

*i.    Elements of a New Value Defense.*

37.    Section 547(c)(4) provides that a preference period transfer is not avoidable "to the extent that, after such transfer, [the] creditor gave new value to or for the benefit of the debtor . . . on account of which new value the debtor did not make an otherwise unavoidable transfer to or for the benefit of such creditor."

38.    To establish the New Value Defense, a defendant must satisfy a three-part test. <u>First</u>, the creditor must have received a transfer that is otherwise voidable as a preference under § 547(b).  <u>Second</u>, after receiving the preferential transfer, the preferred creditor must advance "new value" to the debtor on an unsecured basis.  <u>Third</u>, the debtor must not have fully compensated the creditor for the "new value" as of the date that it filed its bankruptcy petition. *New York City Shoes, Inc. v. Bentley Int'l, Inc. (In re New York City Shoes)*, 880 F.2d 679, 680 (3d Cir. 1989) (emphasis added).

39.    In order to satisfy the second element, a defendant must show "precisely how much" subsequent value was provided after receiving a preferential transfer.  *Authentic Fitness Corp. v. Dobbs Temp. Help Servs., Inc. (In re Warnaco Grp., Inc.)*, No. 03 Civ. 4201 (DAB), 2006

U.S. Dist. LEXIS 4263, at *23 (S.D.N.Y. Jan. 31, 2006) (denying summary judgment on defendant's new value defense).

40.    This includes identifying precisely when the alleged new value was provided.  *See* 11 U.S.C. § 547(c)(4) (new value defense only available "after such transfer, such creditor gave new value . . .") (emphasis added).  "The date for determining the time when new value is provided by the creditor to the debtor is when the new value is delivered." *Cruickshank v. George R. Roberts Co. (In re Boston Grand Prix, LLC)*, 599 B.R. 448, 474 (Bankr. D. Mass. 2019).  A defendant may establish when new value has been provided by submitting bills of lading or other similar documents, which provide evidence of the date upon which the goods were actually received by the Debtors.  *See, e.g.*, *Zeta Consumer Prods. Corp. v. Equistar Chem. L.P. (In re Zeta Consumer Prods. Corp.)*, 291 B.R. 336, 356-57 (Bankr. D.N.J. 2003) (defendant established provision of new value by introducing bill of lading and tracking report to show when shipment was delivered).

### ii.    *Defendant has no admissible evidence to prove the New Value Defense.*

41.    Defendant has failed to produce or indicate that it intends to proffer admissible evidence of <u>what</u> goods were delivered or <u>when</u>.  Based on Defendant's proposed exhibit list, it appears that Defendant intends to introduce numerous bills of lading (the "<u>BOLs</u>") and receipts ("<u>Receipts</u>") to substantiate the New Value Defense.  But neither the BOLs nor the Receipts come close to demonstrating this defense.

42.    <u>The BOLs</u> do not demonstrate that goods covered by the BOLs actually were delivered, nor do they show the date the goods were delivered, nor do they show the monetary value of the goods covered by the BOLs.  In addition, the BOLs are inadmissible hearsay and no hearsay exception applies.

43.    <u>The Receipts</u> suffer from at least two major issues, too.

44.    **First**, the Receipts do not establish the monetary value of what was delivered.  The Receipts list the purchase order numbers that are covered by the Receipts, but Defendant has glaringly failed to produce these purchase orders despite repeated requests.  To the extent that Defendant attempts to overcome this issue by introducing home-made chart that would likewise be inadmissible for numerous reasons, including without limitation, because said charts would violate the best evidence rule.  *See* Fed. R. Evid. 1002 ("An original writing, recording, or photograph is required in order to prove its content unless these rules or a federal statute provides otherwise."); Fed. R. Evid. 1006 ("The proponent may use a summary [or] chart . . . . [but] *[t]he proponent must make the originals or duplicates available for examination or copying, or both, by other parties at a reasonable time and place*.") (emphasis added).

45.    **Second**, while only *some* of the Receipts contain handwritten notations purporting to demonstrate when goods were delivered, the Receipts are inadmissible hearsay under Fed. R. Evid. 802 and no applicable exception applies.  Of course, a hearsay statement is one that "the declarant does not make while testifying at the current trial or hearing" "a party offers in evidence to prove the truth of the matter asserted in the statement."  Fed. R. Evid. 801(c).  *See Porter v. Quarantillo*, 722 F.3d 94 (2d Cir. 2013) (district court did not abuse discretion when it did not admit hearsay statements in support of summary judgment decision and granted cross-summary judgment motion).

46.    The Receipts are textbook hearsay, as Defendant intends to introduce them for the truth of the matter asserted therein – *i.e.*, the date of delivery indicated on the documents – and Defendant has not identified who authored the handwritten notations and has not identified any such witness in its witness list.  Accordingly, they may not be admitted into evidence.

47.     For these reasons, Defendant will be unable to satisfy its burden of establish a New Value Defense.

**C.     Defendant will be unable to demonstrate lack of due diligence.**

48.     The Litigation Administrator anticipates Defendant will allege that the Litigation Administrator undertook insufficient due diligence prior to – and after – commencing this adversary proceeding.

49.     Section 547(b) provides that the Litigation Administrator may bring a preference claim "based on reasonable due diligence in the circumstances of the case and taking into account a party's known or reasonably knowable affirmative defenses under subsection (c)" (the "Due Diligence Undertaking").

50.     The Due Diligence Undertaking was added to Section 547(b) as part of The Small Business Reorganization Act of 2019.  *See* Pub. L. No. 116-54 § 3(a).  Courts have recognized that "[t]here is no explanation, in the Code or in the legislative history to the amendment, of what is required to meet the new requirement."  *Ctr. City Healthcare, LLC v. McKesson Plasma & Biologics LLC (In re Ctr. City Healthcare, LLC)*, Adv. Pro. No. 21-50796 (MFW), 2022 Bankr. LEXIS 1638, at *34-35 (Bankr. D. Del. June 13, 2022) (denying motion to dismiss based on alleged failure to satisfy Due Diligence Undertaking).  Judge Mary Walrath of the Bankruptcy Court for the District of Delaware found that on a motion to dismiss, the Due Diligence Undertaking imposed "no requirement . . . [to] plead how the affirmative defenses are not available," merely that the debtor "considered them."  *Id.* at *36; *accord Insys Liquidation Trust v. Quinn Emanuel Urquhart & Sullivan, LLP (In re Insys Therapeutics, Inc.)*, Adv. Pro. No. 21-50359 (JTD), 2021 Bankr. LEXIS 2965, at *10 (Bankr. Del. Oct. 28, 2021) ("there is no requirement that a plaintiff plead around potential affirmative defenses").

51.     Here, the Litigation Administrator satisfied the Due Diligence Undertaking by conducting reasonable due diligence and taking into account Defendant's known or reasonably knowable affirmative defenses – both prior to, and after commencing the adversary proceeding.

52.     Prior to commencing this adversary proceeding, the Litigation Administrator assessed the total number and dollar amount of transfers that were made to Defendant and considered Defendant's potential defenses, including for example, the Ordinary Course and New Value Defenses.  Specifically, the Litigation Administrator reviewed the Debtors' payment history file, which contained a listing of all invoices paid by the Debtors, including Valdese's invoices. This data contained, for example, invoice numbers, dates, and amounts as well as check numbers, dates, and amounts.  Using this data, the Litigation Administrator and his financial advisor, Karl Knechtel, undertook a review of all potential defendants' possible Ordinary Course and New Value Defenses, among other things.

53.     In assessing a potential defendant's possible Ordinary Course Defense, the Litigation Administrator reviewed the average lateness of transfers in the Preference Period and several baseline periods, as well as the total range of baseline period transfers, and a review of the data based on a single standard deviation analysis.  In relation to Valdese, these analyses led to the conclusion that Valdese had no Ordinary Course Defense.

54.     As to the New Value Defense, the Litigation Administrator compared the invoices as reflected in the Debtors' books and records and created a running balance of the preference claim new of potential new value.  The net preference claim was still substantial – far above the statutory minimum.

55.     The Litigation Administrator was appointed after the sale of substantially all of the Debtors' assets, which added significant complication to satisfying the Due Diligence

Undertaking.  The Court confirmed the plan [PX-9] on May 6, 2019, and approved of the sale of substantially all of the Debtors' assets.  The sale transaction closed on May 3, 2019.  PX-10.  The Litigation Administrator was appointed on June 28, 2019.  PX-11.

56.    Nevertheless, the Litigation Administrator had access to the Debtors' books and records post-sale closing, which enabled the Litigation Administrator to take into account all of the information that he had in his possession, which was more than adequate to satisfy the Due Diligence Undertaking.

57.    Accordingly, the Litigation Administrator satisfied the Due Diligence Undertaking as he was only required to (and did) "consider" Defendant's defenses.  *In re Ctr. City Healthcare, LLC*, 2022 Bankr. LEXIS 1638, at *36.  The fact that the Litigation Administrator disagreed as to whether Defendant actually has any defense does not mean that the Litigation Administrator did not satisfy the Due Diligence Undertaking.

**III.    The Litigation Administrator will show that Defendant violated the automatic stay by cancelling existing purchase orders that were open as of the Petition Date and upcharged the Debtors by $3 per yard.**

58.    Section 362(a) precludes Valdese from engaging in any act to "obtain possession of property of the estate" (11 U.S.C. § 362(a)(3)), or "collect, assess, or recover a claim against the debtor that arose before the commencement of the case under this title."  *Id* (a)(6).

59.    Here, Valdese attempted to collect – or recover on a pre-petition debt owed by the Debtors – by cancelling outstanding pre-petition purchase orders that were open as of the Petition Date, and forcing the Debtors to re-order them post-petition at a $3 upcharge.

60.    Valdese has stated numerous times in writing that it canceled outstanding purchase orders submitted by the Debtors that were open as the Petition Date.  For example, Valdese wrote:

"The pre-petition open orders were cancelled on [Valdese's] books.  As we discussed yesterday we need to review any replacement orders . . . . Lee should send the information

on the orders to Mike Shelton at Valdese.  They will discuss pricing and terms, not[e] nothing is being decided until they see what the Order looks like."

PX-14 (RYNIKER-VALDESE_0000516 at 520).

61.     Each of the purchase orders created a binding contract, which obligated Valdese to perform.  Prior to the issuance of a purchase order, the Debtors asked to purchase a specific quantity of a specific product from Valdese – *i.e.*, an offer.  The issuance of a purchase order by Valdese is the acceptance of that offer that Valdese.  Indeed, the purchase orders were on Valdese's letterhead, which indicated that the transaction had been papered and was in the works on Valdese's end.  Thus, each time Valdese issued a purchase order a contract was formed.  By cancelling the pre-petition purchase orders, Valdese committed a stay violation – in order to gain leverage over the Debtors – by instituting a $3 per yard upcharge as described below.

## IV.    Each of the post-petition transfers were outside the ordinary course of business for numerous reasons.

### A.    Unauthorized transactions outside the ordinary course are avoidable under 11 U.S.C. § 549.

62.     Pursuant to 11 U.S.C. § 363(b)(1), court approval is required for any transfer or use of a debtor's assets for transactions outside of the ordinary course of business.  Pursuant to 11 U.S.C. § 549, "the trustee may avoid a transfer of property of the estate . . . that occurs after the commencement of the case; and . . . that is not authorized under this title or by the court."

63.     "A trustee may avoid a postpetition transfer of property if the trustee proves the following elements: (1) the transfer involved property of the estate; (2) the transfer occurred after commencement of the case; and (3) the transfer was not authorized by the Court or any provision of the Bankruptcy Code."  *Coan v. MDC Corp. (In re Louis Gherlone Excavating, Inc.)*, Adv. Pro. No. 12-03073, 2014 Bankr. LEXIS 5105, at *10 (Bankr. D. Conn. Dec. 19, 2014); *accord*

*Schechter v. Weiler (In re Blair)*, 330 B.R. 206, 213 (Bankr. N.D. Ill. 2005) (similar elements); 10 Collier on Bankruptcy P 6001.01[2] (same).

64.     Pursuant to Fed. R. Bankr. P. 6001, "[a]ny [defendant] asserting the validity of a transfer under § 549 of the Code shall have the burden of proof." *See Graham v. Serafis (In re Vill. Red Rest. Corp.)*, Adv. Pro. No. 20-01065 (MEW), 2021 Bankr. LEXIS 2377, at *45 (Bankr. S.D.N.Y. Aug. 31, 20221) ("Rule 6001 of the Federal Rules of Bankruptcy Procedure provides that the defendants, as the parties asserting the validity of the transfers, have the burden to proof that the transfers were proper and authorized.").

**B.      Legal standards for assessing whether a transaction occurs in the ordinary course of business.**

65.     The term "ordinary course of business" is not defined in the Bankruptcy Code and courts have applied the well-established "horizontal" and "vertical" dimension tests for ascertaining whether a transfer occurred within the ordinary course of business. *In re Vill. Red Rest. Corp.*, 2021 Bankr. LEXIS 2377, at *46. "[I]f either dimension of the test is not satisfied, the disputed transaction is not in the ordinary course of business." *In re Crystal Apparel*, 220 B.R. 816, 831 (Bankr. S.D.N.Y. 1998) (transaction outside the ordinary course).

66.     The horizontal test "considers whether a transaction is one that would normally be entered into by a similar business as a matter of routine." *In re Vill. Red Rest. Corp.*, 2021 Bankr. LEXIS 2377, at *46-47; *In re Enron Corp.*, No. 01-16034 (AJG), 2003 Bankr. LEXIS 2111, at *61-62 (Bankr. S.D.N.Y. Mar. 21, 2003) (horizontal test "involves an industry-wide comparative analysis of the debtor's business to other similar businesses and requires considering whether such other businesses would engage in the proposed transaction as ordinary business.").

67.     The vertical test "considers whether transactions were of a type that creditors would expect to have been made in the ordinary course of business." *In re Vill. Red Rest. Corp.*, 2021

Bankr. LEXIS 2377, at *47; *In re Enron Corp.*, 2003 Bankr. LEXIS 2111, at *59 (vertical test "requires that a bankruptcy court consider whether the transaction imposes economic risks consistent with a hypothetical creditor's expectations measured from the time that the creditor chose to contract with this particular debtor.").  While a transaction may be "necessary to the conduct of a business," that does not *per se* establish the ordinariness of the transaction.  *See In re Vill. Red Rest. Corp.*, 2021 Bankr. LEXIS 2377, at *47.

68.    Courts have avoided similar transactions – involving inflated post-petition payments to a debtor reduce pre-petition debts.  *See, e.g.*, *In re Centennial Textiles*, 227 B.R. 606 (Bankr. S.D.N.Y. 1998) (Bernstein, J.).  *Centennial Textiles* is highly instructive here and involves nearly the same exact facts.  There, the debtors – like the Debtors here – were engaged in the business of converting raw textiles, or greige goods, into finished goods pursuant to their customers' requests.  The debtors owed a creditor (Penn-Tex) approximately $690,000 as of the petition date.  The chapter 11 case eventually converted to chapter 7 and the trustee commenced an adversary proceeding, charging that the debtor's principal agreed to pay the creditor "inflated Penn-Tex invoices covering postpetition processing, enabling Penn-Tex to 'catch up' and reduce its prepetition claim."  227 B.R. at 608.  The trustee established that Penn-Tex "overcharged the debtors" for post-petition services and therefore, the transfers were found to be avoidable because the overpayments were masked payments "on account of prepetition debts, and were unauthorized."  *Id.* at 609-10.

**C.      The post-petition transfers to Valdese were outside the ordinary course for many reasons.**

   ***i.      Valdese cancelled all open purchase orders and instituted a $3 upcharge to recoup its pre-petition debt owed by the Debtors.***

69.      The Litigation Administrator intends to offer testimony that the goods that the Debtors purchased from Valdese were unique, and not able to be sourced from any other vendor outside of Valdese.  Valdese was purportedly owed a significant debt as of the Petition Date.  *See* PX-5 and 6.  Valdese attempted to recoup its losses by leveraging its bargaining position and forced the Debtors to pay a heightened price for goods by (a) cancelling all open purchase orders and (b) forcing the Debtors to accept a $3 per yard upcharge – or abandon its orders that it could not obtain elsewhere.

70.      This fact pattern is the same exact scenario as *Centennial Textiles* – where an overly zealous creditor abused its bargaining position over the debtors – exactly as Valdese did here – to obtain preferential treatment in the post-petition period by obtaining over-payment.  Like the overpayment in *Centennial Textile*, Valdese coerced overpayments out of the Debtors, thereby causing Valdese to be made partially whole on its unsecured debt.  Valdese's treatment came at the expense of other creditors who were not so fortunate.

71.      Valdese's coercion was reflected in numerous written statements to the Debtors, only a few are outlined below:

   (a)      On March 4, 2019, Michael Shelton (Valdese's President and Chief Executive Officer) emailed the Debtors that Valdese would accept post-petition orders from the Debtors "with the following stipulations," which included:

      o   We will cancel all pre-petition open orders that were on our books, and re-enter replacement orders or new orders upon your instructions. . . ."

      o   "We will institute a $3.00 per yard increase on all patterns, for replacement orders or new orders to be entered."

PX-13 (RYNIKER-VALDESE_0000723 at 724); PX-18 (RYNIKER-VALDESE_0000259 at 261 (re-forwarding of same message to the Debtors on April 10, 2019).

(b)     On March 6, 2019, Valdese emailed the Debtors that "[t]he pre-petition open orders were cancelled on [Valdese's] books."  PX-14 (RYNIKER-VALDESE_0000516 at 520).

(c)     On March 12, 2019, Valdese sent the Debtors a letter stating: "The balance of open orders received prior to the bankruptcy filing have been cancelled with new orders entered.  See attached file for detail listing of new orders entered."  PX-15 (RYNIKER-VALDESE_0000731).

(d)     On April 10, 2019, the Debtors wrote to Valdese: "I know that early on you put in an e-mail that you were going to raise our prices $3.  I assumed that your counsel told you that was not legal and that you dropped that idea.  I am now hearing differently.  We need to discuss this.  I cannot approve any purchase orders at any prices higher than the prices prevailing at the time of our filing chapter 11."  PX-17 (RYNIKER-VALDESE_0000269 at 269-70).

(e)     On April 11, 2019, because the Debtors had no leverage to bargain with Valdese, the Debtors capitulated to Valdese's unauthorized upcharging, and stated so in writing: "We are going to pay Valdese what they want now and then deal with the issue post bankruptcy."  PX-21 (RYNIKER-VALDESE_0000498).

**ii.     *Valdese changed the payments terms by requiring payment be made cash in advance instead of shipping goods on credit.***

72.     In addition to recouping its losses, changed the payments terms because it was "firm in a no risk scenario for any new orders" and required the Debtors to pay for all goods in the post-petition period with cash in advance of a shipment – instead of shipping on credit.

73.     The requirement that the Debtors pay cash in advance was a major shift in the Debtors' payments terms.  In the pre-petition period – including in the Preference Period – the Debtors obtained goods on credit, having net 60-120 day payment terms.  *See* PX-5 (proof of claim); PX-6 (proof of claim).

74.     Yet, in the post-petition period, Valdese stated in writing – numerous times – that it would not ship goods unless it received cash in advance.  For example:

(a)     On March 4, 2019, Valdese wrote to the Debtors that an additional "stipulation" for fulfilling new orders post-petition included that "We [Valdese] will accept all orders during the bankruptcy process period on a CIA (cash before production) basis only."     PX-13 (RYNIKER-VALDESE_0000723 at 723-24); PX-18 (RYNIKER-VALDESE_0000259 at 261).

(b)     On March 6, 2019, Valdese wrote: "My client will accept all orders during the bankruptcy process period on a CBD (cash before production) basis only.  They may consider the 50/50 split we discussed, but that is dependent on the size of the Order etc." PX-14 (RYNIKER-VALDESE_0000516 at 520).

(c)     On March 12, 2019, Valdese wrote to the Debtors again: "My client remains firm in a no risk scenario for any new orders. . . . Is Wells Fargo allowing funds to be escrowed (if less than 100% is provided at time of production)."     PX-14 (RYNIKER-VALDESE_0000516 at 519).

(d)     On March 12, 2019, Valdese sent a letter to the Debtors indicating that "Advance payment required prior to releasing orders into production: **$371,963**."  PX-15 (RYNIKER-VALDESE_0000731).

(e)     On March 19, 2019, Valdese wrote to the Debtors: "We will be willing to accept 75% Cash in Advance to put goods in production on the orders placed last week." PX-16 (RYNIKER-VALDESE_0000733 at 734).

(f)     On April 11, 2019, Valdese wrote: "We have shipped approximately $217,523.75, based on my analysis just completed, against the advance payment of $205,118.33. We are going to stop shipping additional product until we can get the balance of the goods currently in production ready to ship.  We believe that we will be in the middle of next week, at that time, we will request payment to cover the value of the shipment prior to release."  PX-22 (RYNIKER-VALDESE_0000571 at 573).

(g)     On April 18, 2019, Valdese wrote again: "Based on payments made against to date shipments[,] we will need a wire payment of $54,848.52 to ship the goods ready to ship.  We will proceed with 100% payment in full on the balance of the shipments as ready."  PX-22 (RYNIKER-VALDESE_0000571 at 572).

75.     Because the Debtors absolutely required Valdese's product, the Debtors could not refuse Valdese's imposed terms.  The Debtors were forced to concede to Valdese's terms and indicated so in writing, stating: "We will need to pay Valdese $54,849 for goods which are ready and will ship as soon as they receive payment.  All other POs in production will have to wait until post-bankruptcy."  PX-22 (RYNIKER-VALDESE_0000571 at 572).

### iii.    *All of the post-petition transfers were made by wire instead of check.*

76.    In the Preference Period, the Debtors paid every single invoice by check.  *See* PX-1-3.  Post-petition, the Debtors were required to make wire transfers, which transferred funds much more quickly to Valdese.  *See* PX-22 (RYNIKER-VALDESE_0000571 at 573) (Valdese writing to the Debtors "[b]ased on payments made against to date shipments we will need a wire payment of $54,848.532 to ship the goods ready to ship."); PX-23 (RYNIKER-VALDESE_0000592) (Debtors paying $47,835.35 in goods via wire).

### iv.    *The Debtors overpaid Valdese and Valdese refused to give the money back without effecting a setoff of amounts purportedly owed to Valdese.*

77.    Finally, due to the numerous amount of wire transfers that Valdese required the Debtors to make *outside of the ordinary course of business*, the Debtors mistakenly overpaid Valdese by approximately $55,000 by mistakenly paying for goods twice.  Instead of simply returning the funds, Valdese continued to exert maximum leverage over the Debtors by setting off its purported debt owed – which it incorrectly calculated – and was only caught due to the Debtors' diligence.  As summarized below:

(a)    On April 25, 2019, a consultant to the Debtors accidentally wired twice to Valdese, writing: "I made a terrible mistake yesterday and overpaid Valdese by $54,848.52. I initiated the first request of $54,848.52 . . . . When I received the $47,835.34 request I forgot I had already sent out the $54,848.52 and created a 2nd wire transfer for a total of $102,683.86 ($54,848.52 + $47,835.34).  PX-25 (RYNIKER-VALDESE_0000662 at 663-64).

(b)    On April 25, 2019, the Debtors contacted Valdese to obtain the refund of the overpayment and Valdese wrote: "this is how we would like to address the payment issue.  Since we are making a shipment today[,] I want to get a total of all invoices shipped since the new orders were entered on 3/12/2019 and bounce that against the payments to clearly determine payments made against shipments and any order in production that might have not made the shipment today . . . . That way we will be able to determine the amount in question."  PX-25 (RYNIKER-VALDESE_0000639 at 639).

(c)     On April 26, 2019, Valdese calculated the net overpayment – after the application of Valdese's supposed setoff was approximately $22,000 – an incorrect amount. Valdese wrote: "Tim, The actual amount of over payment is $22,105.19.  I have requested a wire payment be made . . ."  PX-25 (RYNIKER-VALDESE_0000662 at 683).

(d)     On April 29, 2019, Valdese admitted that it had failed to account for a previous transfer from the Debtors to Valdese in the amount of $30,630.10, and thus the net setoff amount was $40,780.29 (taking into account new goods that were allegedly prepared for the Debtors, which reduced the amount of the refund to the Debtors). PX-27 (RYNIKER-VALDESE_0000691).

(e)     Valdese eventually refunded the Debtors $40,780.29.  PX-29 (RYNIKER-VALDESE_000720).

**V.     Defendant will be unable to assert any credit on account of its reclamation demand.**

**A.     Standards for seeking reclamation.**

78.     It is expected that Defendant will seek either (i) the reclamation of certain goods that were sold to the Debtors; or (ii) a credit that would setoff any liability that Defendant would have to the Litigation Administrator.

79.     Pursuant to 11 U.S.C. §  546(c), the rights and powers of the trustee under sections . . . 547[] and 549 are subject to the right of a seller of goods that has sold goods to the debtor, in the ordinary course of such seller's business, to reclaim such goods if the debtor has received such goods while insolvent, within 45 days before the date of the commencement of a case under this title."

80.     The seller's right to reclaim such goods is subject to a limitations period and must be brought no later than 45 days after the date of receipt of such goods by the debtor; or 20 days after the date of commencement of the case, if the 45-day period expires after the commencement of the case.  *Id.* (c)(1)(A) and (B).

81.     A right to reclamation under Section 546(c) requires that: "(1) the seller has a common-law or statutory right to reclaim the goods; (2) the debtor received the goods while

insolvent; and (3) the seller makes written demand within ten days after receipt of goods by debtor." *In re Flagstaff Foodservice Corp.*, 56 B.R. 899, 905 (Bankr. S.D.N.Y. 1986); *see* 11 U.S.C. § 546(c)(1)(A) (lookback period for seeking reclamation is 45 days from receipt of invoice of 20 days after the petition date if the 45 day period expires post-petition).

82.     In addition, the debtor must be in possession of the goods at the time the demand was made. *Id.* at 908; *In re R.F. Cunningham & Co.*, 2006 Bankr. LEXIS 3650, at *9 (denying reclamation because "[t]he record contains no evidence that the Debtor possessed the goods on June 14 or 17, 2005, when the written reclamation demands were made.").  A seller bears the burden of proving every element of a reclamation claim. *See, e.g.*, *In re Victory Mkts.*, 212 B.R. 738, 741 (Bankr. N.D.N.Y. 1997).

83.     The law is clear that "the failure to take action to protect reclamation rights can lead to loss of the right." *In re R.F. Cunningham & Co.*, 2006 Bankr. LEXIS 3650, at *10 (finding that seller had "failed to diligently assert or protect any alleged right of reclamation" because seller filed motion for reclamation "over a full year after the petition was filed and the demands for reclamation were made").

**B.      A reclamation demand must be made while the Debtors are insolvent.**

84.     UCC-702 permits reclamation if a debtor receives goods "while insolvent."  A seller seeking reclamation, must satisfy Section 101(32)(A)'s definition of insolvency – not only the definition of insolvency under the UCC.  *See* UCC 1-201(23); *see also In re Video King of Illinois, Inc.*, 100 B.R. 1008, 1013 n.6 (Bankr. N.D. Ill. 1989) ("proof of U.C.C. insolvency is required to establish the existence of a right to reclamation under applicable nonbankruptcy law, while proof of Bankruptcy Code insolvency is required to establish the right to enforce the

nonbankruptcy right of reclamation in a bankruptcy case under § 546(c)"); *see also* Collier on Bankruptcy at ¶ 546.04[2][b][iii].

85.     Under Section 101(32)(A) of the Bankruptcy Code, the term "insolvent" with reference to an entity is defined as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of . . . (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors" and "(ii) property that may be exempted from property of the estate under section 522 of this title."

86.     Under Section 1-201(23) of the UCC, the term insolvent is easier to demonstrate and merely requires: "(A) having generally ceased to pay debts in the ordinary course of business other than as a result of bona fide dispute; (B) being unable to pay debts as they become due; or (C) being insolvent within the meaning of federal bankruptcy law."

87.     In proving insolvency for purposes of a reclamation claim, courts have found that a seller may not rely on Section 547(f)'s presumption of insolvency, finding that this presumption applies solely and exclusively in relation to a preference claim.  *See, e.g.*, *Monfort, Inc. v. Kunkel (In re Morken)*, 182 B.R. 1007, 1021 (Bankr. D. Minn. 1995) (seller offered no evidence of insolvency and rejecting argument that 11 U.S.C. § 547's presumption of insolvency applied because "the presumption of insolvency is for preference purposes only").

**C.     The reclamation demand fails for numerous grounds.**

> **i.     *Defendant cannot satisfy its burden to demonstrate when goods subject to the reclamation demand were actually received by the Debtors.***

88.     A reclamation demand must be made no later than 45 days after the Debtors' receipt of goods or no later than 20 days after the Petition Date.  *See* 11 U.S.C. § 546(c).  The reclamation demand (PX-30) is completely devoid of any delivery information.  It only contains an invoice date and due date.  Several of the due dates span to December 2018 – before the reclamation period

(45 days prior to the Petition Date).  Defendant's other charts purporting to show when goods were received by the Debtors are inadmissible, including without limitation, because they lack authentication, are hearsay, and are subject to the best evidence rule.  The reclamation demand fails on this basis alone.

> ii.     ***Defendant will be unable to demonstrate what goods were in the Debtors' possession when the reclamation demand was made.***

89.     The law is absolutely clear that the Debtors were required to be in possession of the goods subject to the reclamation demand when it was sent.  *In re Flagstaff Foodservice Corp.*, 56 B.R. at 908; *In re R.F. Cunningham & Co.*, 2006 Bankr. LEXIS 3650, at *9 (denying reclamation because "[t]he record contains no evidence that the Debtor possessed the goods on June 14 or 17, 2005, when the written reclamation demands were made.").

90.     Defendant's exhibit list contains absolutely no evidence to demonstrate whether the Debtors were in possession of any of the goods – or which goods – subject to the reclamation demand.  For yet another reason, Defendant will likely fail to carry its burden as to its reclamation demand.

> iii.    ***Defendant failed to undertake sufficient action after sending the reclamation demand.***

91.     The law is also clear that Defendant was required to "diligently assert or protect any alleged right of reclamation" and cannot wait for "over a full year after the petition was filed and the demands for reclamation were made" to do so.  *In re R.F. Cunningham & Co.*, 2006 Bankr. LEXIS 3650, at *10.

92.     That is exactly what Defendant did here.  It sent a single reclamation demand in February 2019 – two and a half years ago.  Since then, Defendant has done nothing whatsoever to protect its reclamation rights.

### iv. *Defendant will be unable to prove that the Debtors were insolvent when it received the goods subject to the reclamation demand.*

93.    Finally, the reclamation demand fails because Defendant will be unable to prove that the Debtors were insolvent at the time that the goods subject to the reclamation demand were made.  As a preliminary matter, in its defense of the preference claim Defendant asserts that the Debtors were *not* insolvent during the 90 day period prior to the Petition Date.  Thus, Defendant cannot assert the Debtors *were* insolvent during the second half of that same time period for purposes of its reclamation demand.  Moreover, Defendant has not identified any witness, let alone an expert, who can testify to solvency.  Nor has Defendant identified any evidence it will offer to demonstrate the Debtors' insolvency.

22174148